IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BENTEL & COMPANY, LLC, a
Texas Limited Liability
Company,

                Plaintiff,

        v.

SCHRAUBENWERK ZERBST GmbH, a
Foreign Limited Liability
Company,

                Defendants.

Case No. 16 C 11479

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion to Dismiss under Rule 12(b)(2) and Rule 12(b)(3) [ECF No. 10]. For the reasons stated herein, the Motion under Rule 12(b)(3) is granted on *forum non conveniens* grounds. The Court will issue an Order of Dismissal upon receipt of Schraubenwerk Zerbst GmbH's written statement agreeing to the conditions enumerated herein.

### I. BACKGROUND

### A. Factual Background

Plaintiff Bental & Company, LLC ("Bental") is a Texas management and consulting company with a principal place of business in Toledo, Ohio. (ECF No. 1 ("Compl.") ¶ 1; ECF No. 15 ("Pl.'s Br.") at 2.) Bental's sole member and owner, Lothar Bauerle ("Bauerle"), resides in the Toledo, Ohio area. (Pl.'s

Br., Ex. B ("Bauerle Decl.") ¶ 3.) Early in 2010, Bauerle contacted several component and subsystem manufacturers in the wind power industry, including Defendant Schraubenwerk Zerbst GmbH ("SZ"), to see if they would be attending an upcoming wind power exhibition in the U.S. (Compl. ¶¶ 12-13; Bauerle Decl. ¶¶ 7-8.) SZ is a German company that manufactures forged bolts and hot-formed fasteners for use in various industries, including the wind power industry. (ECF No. 11 ("Def.'s Mem."), Ex. A ("Schmidt Decl.") ¶ 10.) One of SZ's principals informed Bauerle that no SZ representative would be attending but that SZ was willing to follow up with him after the exhibition to discuss the state of the American wind power market. (Bauerle Decl. ¶¶ 9-10.)

At some point after the exhibition and during the summer of 2010, Bauerle proposed to SZ that he scout for new potential SZ customers in the three NAFTA countries – Mexico, the U.S., and Canada. (Schmidt Decl. ¶¶ 14-15.) In July 2010, Bauerle traveled to SZ's place of business in Germany to begin negotiating an agreement that would govern the Bental-SZ relationship. (*Id.* ¶¶ 17-19; Bauerle Decl. ¶¶ 13-14.) Bauerle returned to Ohio, engaged in additional telephone and email discussions with SZ, and ultimately signed an August 1, 2010 final version of the agreement ("the Commission Agreement") upon

its transmission from SZ's German office to him in Ohio. (Schmidt Decl. ¶¶ 19-20; Bauerle Decl. ¶¶ 13-14.) As relevant, the Commission Agreement provided that "Bental shall with immediate effect act as representative of [SZ] in the Nafta states (USA, Canada, Mexico), in the fastener product groups 'Wind Power,' 'Rail Track,' and other 'Industrial Applications'." (Pl's Br., Ex. B at Att. 1 ¶ 1.) Bental's duties were "perform[ing] market analyses, establish[ing] customer contacts, receiv[ing] relevant client inquiries and subsequent projects, and forward[ing] them to [SZ]." (*Id.* ¶ 3; *see,* Schmidt Decl. ¶ 22.) SZ agreed to provide informational support to Bental and bear travel costs Bauerle incurred in carrying out his duties. (*Id.* ¶ 4.) The Commission Agreement also provided that SZ would "pay Bental a performance-based commission of 5% after conclusion of each quarter of the calendar year" but, because no commissionable projects existed at the time of execution, SZ agreed to pay "Bental monthly a retainer of 1,000.00 US Dollars" to be adjusted based on SZ's prospects for successful projects and Bental's "acquisition expenses." (*Id.* ¶ 5.) The $1,000 payment along with travel reimbursements were to cease once SZ commenced commission payments on eligible projects – that is, once Bental's efforts bore fruit in the form of SZ sales to new clients. (*Ibid.*) Each

party had the right to terminate "subject to a three-month period of cancellation," and in such a scenario, Bental was to receive commission payments "for the worked-on projects, provided they lead to a contract within 24 months from the termination date of the agreement." (*Id.* ¶¶ 6-7.) The Commission Agreement did not specify a governing law or choice of forum.

In furtherance of Bental's responsibilities, SZ printed and provided Bental with business cards containing SZ's logos, its website address, and titling Bauerle as "Project Manager" reachable at Bental's Ohio address. (Bauerle Decl. ¶ 20 & Att. 3.) SZ also listed designated Bental as its "US Representation" on letterhead and in certain presentation materials. (*Id.* ¶¶ 21-22 & Atts. 4-5.) Other than as detailed below, SZ has never had any contacts with Illinois. (*See, e.g.,* Schmidt Decl. ¶¶ 5-9.)

Bental proposed to SZ several potential Illinois targets, and SZ approved its approaching Nordex USA, Inc., a Chicago-headquartered division of Nordex Global. (Bauerle Decl. ¶¶ 23-24 (According to Bauerle, SZ also entered into non-disclosure agreements ("NDAs") with two Illinois entities governed by Illinois law, but with whom SZ did not ultimately establish a relationship. (*Id.* ¶ 25.)) Since 2006, SZ has had a business

relationship with Nordex Global, to whom it supplies various hardware and fastener components. (Schmidt Decl. ¶¶ 25, 27.)

On August 16, 2010, Bauerle sent a letter to Nordex USA's purchasing manager, acknowledging SZ's gratitude for Nordex Global's business and that "[t]hrough my diligent work Zerbst would like to become an approved direct supplier to Nordex USA, Inc." (Bauerle Decl. ¶¶ 26-27 & Att. 6.) He requested a meeting to determine the feasibility of SZ directly supplying Nordex USA, whose production facility was located in Jonesboro, Arkansas. (*Ibid.; see,* Schmidt Decl. ¶ 24.) Following the letter, Bental and SZ were granted access to Nordex USA's "electronic 'ShareFile' folder maintained in Chicago, Illinois containing the necessary information for SZ to compete for Nordex business in the U.S." (Pl.'s Br. at 4-5 (citing Bauerle Decl. ¶ 28).) Bental then prepared SZ-approved quotes and proposals, and submitted them to Nordex USA in Chicago. (Bauerle Decl. ¶ 29.) Bauerle alleges that his overtures to Nordex USA convinced it to partner with SZ, resulting in the placement of its first purchase orders for SZ products in February 2011. (*Id.* ¶¶ 30, 32 ("Prior to my contact with Nordex USA, SZ never sold any of its products directly to that entity.").) Although ostensibly beyond the ambit of Bental's duties under the Commission Agreement, Bauerle also translated

emails from English to German, and vice versa, for communications between SZ and its U.S. customers, including Nordex USA. (*Id.* ¶¶ 17-18.)

When Nordex USA placed purchase orders for SZ products, it emailed them to Bental's Ohio office, and Bauerle then forwarded them to SZ along with Nordex USA's qualifications, specifications, and drawings. (Bauerle Decl. ¶ 31.) SZ then supplied Nordex USA's Arkansas facility with the requested products; no SZ product was ever shipped into Illinois. (Schmidt Decl. ¶ 24.) Thanks to Nordex USA's purchase orders, SZ and Bental amended the Commission Agreement effective February 14, 2012 through a course of dealing shorter than but otherwise similar to that characterizing its initial negotiation – in-person discussions in Germany and subsequent Ohio-Germany communications, with each party signing the final agreement from its home office. (*Id.* ¶¶ 32-34; Bauerle Decl. ¶¶ 14-15.) Gone were the $1,000 monthly retainer and travel reimbursements, in favor of a fixed schedule of commissions under which Bental received 5 percent of sales per calendar year up to €400,000, 4 percent of sales in the €400,000-500,000 range, and 3 percent of sales in excess of €500,001. (Pl.'s Br., Ex. B at Att. 2.) When Bental's commission payments came due, SZ initiated wire transfers to Bauerle's Ohio bank account – sometimes paying him

in Euros and other times in U.S. Dollars. (*Compare,* Bauerle Decl. ¶ 19; *with,* Schmidt Decl. ¶ 36.)

Nordex USA's purchases from SZ were governed by General Purchasing Conditions ("GPC"), which applied "in relations with companies, public law bodies and any other third party entity providing Services ('Supplier')." (Pl.'s Br., Ex. B at Att. 8 ¶ 1.1.) The terms of the GPC were "governed by and construed in accordance with the laws of the state of Illinois," and initially the parties agreed to "submit to exclusive personal jurisdiction in Illinois" and "waive any and all personal right under the law of any jurisdiction to object on any basis (including inconvenience of the forum) to jurisdiction or venue within Illinois for the purpose of litigation to enforce these GPC." (*Id.* ¶¶ 15-16.) However, on March 22, 2011 - six weeks after initial execution of the GPC – SZ and Nordex USA replaced the forum selection clause with language mandating that disputes exceeding $1,000,000 "shall be submitted by either Party to the American Arbitration Association for binding arbitration in Chicago, Illinois." (*Id.* ¶ 16.1 (Revised).)

In September 2012, Nordex USA informed Bental of missing parts it had purchased from SZ related to installation of wind turbines for a project in Beebe, Michigan. (Bauerle Decl. ¶¶ 48-50.) SZ prepared a letter to Nordex USA confirming that

Bental "was acting as an 'agent' of SZ and that SZ was 'directly and exclusively liable for all activities' performed" by Bental related to this issue. (*Id.* ¶ 50.)

SZ terminated the Commission Agreement (as amended) in April 2015. By then, Bauerle had traveled to Chicago "on at least eight (8) separate occasions on behalf of SZ" since initiating contact with Nordex USA in August 2011. (Bauerle Decl. ¶ 40.) SZ sold approximately $2.3 million of products to Nordex USA between 2011 and 2013, paying Bental an estimated €42,000 and over $10,000 in commissions on those sales. (*Id.* ¶¶ 41-42.) However, Bental claims that SZ still owes it some $50,000 in commissions on sales to Nordex USA (and over $100,000 on sales to Florida-based Siemens). (*Id.* ¶¶ 43-47.)

### B. Procedural Background

To recover at least some of these allegedly unpaid commissions, Bental retained German counsel to issue a demand letter on May 21, 2015, making claims on SZ under specific provisions of German law. (*See, generally,* Pl.'s Br. at Ex. A.) In a June 22, 2015 response letter, SZ's counsel asked for substantiation of Bental's claims and asserted that SZ had in fact remitted unearned commission payments to Bental in 2013 and 2014. (*See, id.* § 2.) SZ thus sought repayment of those

commissions under German "tort law" and "law of unjust enrichment." (*Ibid.*)

Bental then filed suit against SZ on September 9, 2015 in the Northern District of Ohio. *See, Bental & Co., LLC v. Schraubenwerk Zerbst GmbH,* No. 3:15 C 1833 (N.D. Ohio). The parties fully briefed the issue of SZ's personal jurisdiction, and on September 21, 2016, the court dismissed the case for lack of personal jurisdiction under Ohio's long-arm statute. *See, generally, Bental,* 2016 WL 5173327 (N.D. Ohio Sept. 21, 2016). The court found that Bental failed to demonstrate that "SZ's contacts with Ohio, either directly or through Bental as its alleged agent, give rise to its cause of action for failure to pay commissions." *Id.* at *3. The court noted the absence of evidence that Bental's "activities were commissionable under the parties' contract, and (2) if so, that its cause of action 'arises from' those activities as required per Ohio Revised Code § 2307.382(C)." *Ibid.* ("[E]ven if I found SZ transacted business in Ohio, [Bental] does not show its causes of action 'arise from' those contacts.") (citation omitted).

Bental filed its Complaint in this case on December 20, 2016, asserting the same four causes of action: breach of contract, violation of the Ohio and Illinois statutes governing sales commissions, and unjust enrichment. SZ seeks dismissal of

these claims for lack of personal jurisdiction under Rule 12(b)(2) or, in the alternative, pursuant to the *forum non conveniens* doctrine under Rule 12(b)(3).

## II. <u>ANALYSIS</u>

### A. SZ'S Rule 12(b)(2) Motion to Dismiss

The issue presented is whether SZ's business relationship with Chicago-based Nordex USA and its other contacts with potential customers headquartered in Illinois – alone or through Ohio-based Bental as its putative agent – subject SZ to personal jurisdiction in this case for breach of the Commission Agreement, under which allegedly unpaid commissions are keyed to SZ's sales to Nordex USA. The Court finds that SZ indeed has minimum contacts in Illinois sufficiently related to the conduct giving rise to the alleged breach of contract to justify exercising specific jurisdiction. Doing so is not inconsistent with traditional notions of fair play and substantial justice.

### 1. *Rule 12(b)(2) Legal Standard*

A complaint need not include facts alleging personal jurisdiction but when a defendant challenges personal jurisdiction under FED. R. CIV. P. 12(b)(2), the plaintiff bears the burden of proving that jurisdiction exists. *Purdue Res. Found. v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003). Where, as here, the Court rules on a motion to dismiss

for lack of personal jurisdiction based on the submission of written materials – and not based on evidence presented at an evidentiary hearing – the plaintiff "need only make out a *prima facie* case of personal jurisdiction." *Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 713 (7th Cir. 2002). In evaluating whether the prima facie standard has been satisfied, the plaintiff "is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." *Purdue,* 338 F.3d at 782 (citations, quotation, and internal quotation marks omitted).

A district court may exercise jurisdiction only if both the state and federal constitutional requirements are satisfied. *Illinois v. Hemi Group LLC,* 622 F.3d 754, 756 (7th Cir. 2010). Where subject matter jurisdiction rests on diversity under 28 U.S.C. § 1332, personal jurisdiction turns on the law of the forum state. *Hyatt,* 302 F.3d at 713. The Illinois long-arm statute authorizes personal jurisdiction to the full extent permitted by the federal Constitution. 735 Ill. Comp. Stat. 5/2-209(c). However, because Illinois permits personal jurisdiction if it would be authorized by either the Illinois or United States Constitutions, the state statutory and federal constitutional requirements merge. *uBID, Inc. v. The GoDaddy Group, Inc.,* 623 F.3d 421, 425 (7th Cir. 2010).

There are two variants of personal jurisdiction: "general" and "specific." General jurisdiction is proper only when the defendant has "continuous and systematic" contacts with the state in question such that a district court may exercise personal jurisdiction over the defendant even in cases that neither arise out of nor relate to the defendant's forum contacts. Specific jurisdiction, on the other hand, is a more limited assertion of state power in which personal jurisdiction exists for controversies that arise out of or are related to the defendant's forum contacts. *See, Hyatt,* 302 F.3d at 713.

Finally, even if a court finds that the minimum contacts and specific jurisdiction requirements have been met, its due process inquiry does not end. It must also consider whether the exercise of personal jurisdiction comports with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. State of Washington,* 326 U.S. 310, 320 (1945)).

### 2. *Specific Jurisdiction over SZ*

Bental concedes that this Court does not have general jurisdiction over SZ. (*See,* Pl.'s Br. at 9 ("BENTAL suggests application and analysis of only specific jurisdiction is necessary in the present case.").) Even if it didn't make this concession, Bental could not advance a colorable general

jurisdiction argument. *See, Hyatt,* 302 F.3d at 713 (explaining that the plaintiff's only option is to establish specific jurisdiction where a defendant's contacts with the forum state are more limited). If jurisdiction inheres in this controversy, it is on the basis of specific jurisdiction such that the harm to Bental must have arisen out of SZ's contact with Illinois.

Exercise of specific jurisdiction is appropriate where (1) the defendant has purposefully directed its activities at the forum state or purposefully availed itself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities. *Tamburo v. Dworkin,* 601 F.3d 693, 702 (7th Cir. 2010).

### a. *Minimum Contacts and Purposeful Availment*

The Court takes as its starting point the guiding principle that "an out-of-state party's contract with an in-state party is alone not enough to establish the requisite minimum contacts" with the forum State in a breach of contract action. *RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1277 (7th Cir. 1997) (citing *Burger King,* 471 U.S. at 478). This means that neither SZ's contracting with Nordex USA, nor its execution of NDAs with two other Chicago-based potential customers, suffices to establish minimum contacts here. Such restraint seems particularly justified where the contract with the forum

resident is not the contract alleged to have been breached. Other links, such as prior negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing, may demonstrate that the defendant has purposefully availed itself of the forum. *Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 913 (7th Cir. 2015). And, of course, the defendant need not have been physically present but only to have acted indirectly within the forum state. *See, Heritage House Rests., Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276, 281 (7th Cir. 1990). That said, "a physical presence in the forum State may satisfy the requisite contacts for jurisdiction, especially when a representative of the foreign corporation is directing marketing efforts at the forum State." *Tile Unlimited, Inc. v. Blanke Corp.*, 47 F.Supp.3d 750, 762 (N.D. Ill. 2014) (citations omitted).

The non-party contracts are not SZ's only contacts with Illinois. Minimum contacts sufficient for personal jurisdiction over a nonresident entity may be established through an agent of the entity. *See, e.g., Walden v. Fiore,* 134 S.Ct. 1115, 1122 (2014) ("[P]hysical entry into the State – either by the defendant in person or *through an agent*, goods, mail, or some other means – is certainly a relevant contact.") (emphasis added) (citation omitted); *Wisconsin Elec. Mfg. Co. v. Pennant*

*Prods., Inc.,* 619 F.2d 676, 677-78 (7th Cir. 1980) (visits by defendant's agents to forum state in order to negotiate with plaintiff were "significant in the formation of the contract" and constituted sufficient contact so as to satisfy due process); *CapGain Props. Inc. v. Landmaster Partners, LLC,* No. 15 C 9234, 2016 WL 3035534, at *2-3 (N.D. Ill. May 29, 2016). To establish agency, the alleged agent must have either actual or apparent authority from the principal, or the principal must "ratify" the unauthorized agent's actions through later conduct. *Anetsberger v. Metro, Life Ins. Co.,* 14 F.3d 1226, 1234 (7th Cir. 1994); *see, ABN AMRO, Inc. v. Capital Int'l Ltd.,* 595 F.Supp.2d 805, 821 (N.D. Ill. 2008). A principal ratifies an action that the agent lacked authority to take by later retaining the benefits flowing from the action. *See, e.g., Advance Mortg. Corp. v. Concordia Mut. Life Ass'n,* 481 N.E.2d 1025, 1030-31 (Ill. App. 1985) ("[E]ven if we were to find that Advance, as an agent for Concordia, acted outside its authority, Concordia retained the benefits of Advance's action such as to constitute a ratification thereof.").

The Court finds that Bauerle acted with actual authority sufficient for his Illinois contacts to inure to SZ when, for example, he made initial overtures to Nordex USA about doing business with SZ and drove to Chicago at least eight times to

meet with Nordex USA personnel regarding its relationship with
SZ.  In addition, Bental has adduced sufficient evidence of its
apparent authority to bind SZ to commitments regarding Nordex
USA, given its status as SZ's U.S. representative on business
cards and in other outward statements to which Nordex USA was
likely exposed.  (Bental even adduced evidence that SZ made
statements *specifically to Nordex USA* designating Bauerle as its
agent with respect to certain problems attending Nordex USA's
Beebe, Michigan wind farm project.)  At the very least, SZ
ratified the benefits of Bental's efforts when it entered into
and maintained a business relationship with Nordex USA on these
terms until 2013 – a relationship pursuant to which it sold over
$2 million worth of product to Nordex USA.  *See, Walden*, 134
S.Ct. at 1122 ("[W]e have upheld the assertion of jurisdiction
over defendants who have purposefully 'reached out beyond' their
State and into another by, for example, entering a contractual
relationship that 'envisioned continuing and wide-reaching
contacts' in the forum State . . . .") (quoting *Burger King*, 471
U.S. at 479-80) (brackets omitted).  The situation here is not
one in which "the unilateral activity of the plaintiff or some
other entity" is being imputed to SZ.  *Purdue,* 338 F.3d at 780.
On the contrary, Bauerle directed his activities to Nordex USA
and Illinois with SZ's approval, at its behest, and in order to

benefit it - with no shortage of representations that this was
the case.

The Court therefore finds that SZ has minimum contacts with
Illinois.

### b.   Relatedness

Establishing minimum contacts is only the first part of the
inquiry, and alone they are insufficient to support exercise of
specific personal jurisdiction.   Rather, it is essential that
the plaintiff's claim arise out of or relate to the defendant's
minimum contacts with the forum state.   *uBID,* 623 F.3d at 429.
As the *RAR* court noted, "[w]e cannot simply aggregate all of a
defendant's contacts with a state – no matter how dissimilar in
terms of geography, time, or substance – as evidence of the
constitutionally required minimum contacts."   *RAR,* 107 F.3d at
1277.   The action "'must *directly arise* out of the specific
contacts between the defendant and the forum state.'"  *Id.* at
1278 (emphasis in original) (quoting *Sawtelle v. Farrell,* 70
F.3d 1381, 1389 (1st Cir. 1995)).

In this case, SZ argues strenuously that its contacts with
Illinois are unrelated to Bental's suit for breach of the
Commission Agreement, and thus cannot ground specific
jurisdiction.   SZ is correct that, per the Seventh Circuit, "it
is only the 'dealings *between the parties in regard to the*

*disputed contract*' that are relevant to minimum contacts analysis." *RAR,* 107 F.3d at 1278 (emphasis in original) (quoting *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.,* 75 F.3d 147, 153 (3d Cir. 1996)). But the parties' dealings in regard to the disputed agreement – that is, the respective conduct of Bental and SZ to be adjudicated in allocating SZ's liability under the Commission Agreement – "lie[] in the wake of [SZ's] commercial activities in Illinois" and Florida. *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.,* 726 F.2d 1209, 1215-16 (7th Cir. 1984) ("[T]he discussions that took place in Illinois between [a manufacturer's representative] and [the defendant's sole shareholder] played a part in the subsequent [out-of-state] negotiations between [the latter] and the plaintiff, which led to the contract between [the manufacturer] and the plaintiff.").

Whether Bental can recover under the Commission Agreement turns not just, for example, on that contract's construction and enforceability, but also crucially on the timing, nature, and extent of SZ's sales to and payments from Nordex USA and Siemens. Unlike the situation in *RAR* where "[t]he outcome of this particular breach of contract action . . . will not turn on any facts developed from RAR's prior forum contacts," 107 F.3d at 1279, facts developed from SZ's prior Illinois contacts will

indeed determine a large part of Bental's claimed contractual entitlements. Instead of the defendant's "prior Illinois contacts tell[ing] the court nothing about RAR's cause of action and shed[ding] little light even on the contract generally," *ibid.*, Bental's recovery under the Commission Agreement is significantly indebted to SZ's Illinois contacts, which shed light on Bental's potential entitlements under that agreement and on the agreement's "economic substance." *Id.* at 1278. For example, SZ's securing Nordex USA's business triggered the provision in the original Commission Agreement scotching the monthly retainer and travel expense reimbursements in favor of the commission schedule negotiated in the amendment. In addition, the GPC governing Nordex USA's purchase of products from SZ –which, incidentally, chooses Illinois law and initially contained an Illinois forum-selection clause – expressly designates "third party entities providing services" related to Nordex USA's purchases as the "Supplier" counterparty. This provision plainly seems to contemplate Bental, given all the services Bauerle supplied for every Nordex USA purchase. Whereas the "primary similarity between the disputed contract" and the prior forum contacts in *RAR* was the identity of parties, *ibid.*, here the primary *difference* between the disputed contract

and the prior Illinois contacts is the lack of complete identity of parties.

Indeed, crediting SZ's position requires reading "in regard" out of the *Vetrotex* court's holding, which the Seventh Circuit expressly adopted in *RAR*. Had either court wished, it could have easily limited the dealings relevant to the minimum contacts analysis in a contract case to those "between the parties *to* the disputed contract." Needless to say, neither court did. As such, the dealings of SZ and Bental *in regard to* the Commission Agreement properly implicate SZ's Illinois contacts with Nordex USA. By putting in place an agreement under which it was obligated to pay commissions on sales resulting from its agent's successful efforts, SZ knew when it subsequently directed its agent to solicit Nordex USA in Illinois and initiated a successful years-long business relationship with Nordex USA, that it might be suable in Illinois should either contractual relationship sour.

The Court feels compelled to say a few words about the Ohio litigation. As an initial matter, this case might well be consonant with the outcome there on the Ohio court's own terms. The court took pains to note that Bental had failed to show commissionable Ohio activities – that is, a relation between SZ's sole contacts with Ohio as a contractual counterparty and

Bental's own activities in the state. Here, however, Bental's account (which the Court must credit at this stage) speaks of commissionable activities in Illinois that *were* related to SZ's contacts with the state. In any event, to the extent the Ohio court's personal jurisdiction conclusion might bump up against this Court's, that may well flow from two outcome-determinative facets of Ohio law that do not apply here.

First, unlike Illinois's long-arm statute, the Ohio long-arm statute is not coextensive with – and confers jurisdiction more narrowly than - due process under the Constitution. *See, Schneider v. Hardesty,* 669 F.3d 693, 699 (6th Cir. 2012); *Calphalon Corp. v. Rowlette,* 228 F.3d 718, 721 (6th Cir. 2000) ("[T]he Ohio Supreme Court has ruled that the Ohio long-arm statute does not extend to the constitutional limits of the Due Process Clause.") (citation omitted). As such, the court did not collapse the state into the federal due process inquiries, as Illinois federal courts do, but instead ended its analysis when it found application of the Ohio long-arm statute wanting. *See,* 2016 WL 5173327 at *2-3 ("I find Plaintiff failed to present a prima facie showing that this Court has personal jurisdiction pursuant to Ohio's long-arm statute. Whether this Court's exercise of jurisdiction would offend the limitations of

federal due process requirements is, therefore, nugatory.")
(internal citations omitted).

Second, the Ohio long-arm statute requires a proximate
cause relationship between the defendant's contacts with the
forum and the plaintiff's cause of action. *See,* 2016 WL 5173327
at *2. No such onerous requirement obtains under either the
Illinois or federal constitution, and indeed the Seventh Circuit
has expressly disapproved of such an approach, noting that the
"precise causal relationship between contacts and claim" should
not be dispositive. *See, uBID,* 623 F.3d at 430 ("[R]equiring
proximate causation between contacts and claim would exclude too
many claims. . . ."). While this Court does not impermissibly
swing the pendulum to the other amplitude, see, *RAR,* 107 F.3d at
1278 (rejecting but-for causation), it finds that the contacts
alleged and the wrongs alleged "are so intimately related that
[SZ] cannot reasonably have been surprised to find itself sued
in Illinois." *uBID,* 623 F.3d at 431.

Therefore, Bental's lawsuit sufficiently arises out of and
is related to SZ's minimum contacts with Illinois such that
specific jurisdiction is proper.

### 3. *Fairness Analysis*

Finally, the Court must satisfy itself that exercising
specific jurisdiction over SZ would not offend "traditional

notions of fair play and substantial justice." *Asahi Metal Indus. Co. v. Sup. Ct. of Cal.,* 480 U.S. 102, 113 (1987). An examination of fair play and substantial justice takes into account "'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and 'the shared interest of the several States in furthering fundamental substantive social policies.'" *Burger King,* 471 U.S. at 477 (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292 (1980)). The ultimate constitutional lodestar is whether it is "fair and reasonable to call the defendant into the state's courts to answer the plaintiff's claim." *uBID,* 623 F.3d at 426.

### a. The Burden on the Defendant

The first factor weighs slightly against a finding of fairness, as traveling to Illinois from Germany does burden SZ. Worth keeping in mind, however, is the fact that "out-of-state defendants *always* face such a burden," *Felland v. Clifton,* 682 F.3d 665, 677 (7th Cir. 2012) (emphasis in original), and the extent to which "modern methods of transportation and communication have significantly ameliorated [the] burden" of defending suit in a forum other than one's residence.

*Sculptchair, Inc. v. Century Arts, Ltd.,* 94 F.3d 623, 632 (11th Cir. 1996) (citation omitted); *see, Menken v. Emm,* 503 F.3d 1050, 1060 (9th Cir. 2007) ("[W]ith the advances in transportation and telecommunications and the increasing interstate practice of law, any burden [of litigation in a forum other than one's residence] is substantially less than in days past."); *see also, Synthes (U.S.A.) v. G.M. Dos. Reis Jr. Ind. Com de Equip. Medico,* 563 F.3d 1285, 1299 (Fed. Cir. 2009) (same). Further, the burden on SZ personnel to travel from Germany to any other potential U.S. forum – for example, Florida – is effectively the same, and if the action were to proceed in Germany, Bental would bear an analogous travel burden. *See, e.g., Innovation First Int'l, Inc. v. Zuru, Inc.,* No. 3:11 C 2726, 2012 WL 12897157, at *6 (N.D. Tex. Apr. 10, 2012) ("Requiring Plaintiff to travel to a foreign forum to pursue a remedy would merely shift travel burdens from the Defendant to the Plaintiff.").

A few other considerations warrant a mention. For one, the parties did not include a forum selection clause in the Commission Agreement, suggesting that SZ did not devote any resources *ex ante* in reliance on a particular forum. Moreover, SZ retained U.S.-based counsel in the Ohio action and has retained a Chicago-based law firm in this case, both of whom

appear to have ably represented SZ's interests.  This alleviates to some extent conventional concerns about the travails of international defendants navigating a foreign legal system.  *See, Asahi,* 480 U.S. at 114.  Therefore, although the burden on SZ weighs against a finding of fair play and substantial justice, it does so only slightly.

      *b.  Illinois's Interest in Adjudicating the Dispute*

      The second factor weighs moderately against a finding of fairness.  Illinois's interest in adjudicating this breach-of-contract action between an Ohio LLC and a German company – even if it involves some evidence located in Illinois - is minimal.  The only minor interest Illinois has in this case is application of its state law, under which Bental has brought a claim.  While Chicago-based Nordex USA may have an interest in the outcome of this case, it is not a party, nor is it alleged to be a victim in any way of SZ's conduct.

      *c.  The Plaintiff's Interest in Obtaining*
      *Convenient and Effective Relief*

      The third factor, however, weighs significantly in favor of a fairness finding.  This forum is much more convenient for Bental to pursue its claims than Florida or Germany would be, and it has already incurred costs in filing the unsuccessful Ohio action.  In light of this procedural history, the statute

of limitations on Bental's claim might expire – undermining the effectiveness of relief elsewhere – if it is forced to re-file this lawsuit again in a third forum.

> d.  *The Interstate Judicial System's Interest*
> *in Obtaining the Most Efficient*
> *Resolution of Controversies*

The fourth factor weighs moderately in favor of a fairness finding.  Although Bental claims more commissions on SZ's sales of products to Florida-based Siemens than on sales to Nordex USA, litigating the action here is a more efficient allocation of interstate judicial resources.  Assuming equal amounts of evidence in the possession of Nordex USA in Illinois and Siemens in Florida, it will nonetheless be easier for all involved to obtain written and oral discovery from Ohio if this Court is home base for the action.  Discovery will thus take less time, and this dispute can be more quickly purged from the federal docket.  (The Court also notes that it enjoys a comparative advantage, however slight, in applying Bental's claims under the Illinois sales commission statute, and that Bental in neither its Ohio nor Illinois Complaints asserted Florida state-law claims.)

*    *    *

In sum, the first factor slightly weighs against personal jurisdiction, and the second factor does so moderately.  The

third factor significantly and the fourth factor moderately cut in favor of personal jurisdiction. (The fifth factor concerning the States' fundamental substantive social policies appears inapplicable.) Although the fair play considerations do not overwhelmingly favor Bental, they do support characterizing exercise of personal jurisdiction in this case as consistent with "fair play and substantial justice." Exercising personal jurisdiction over SZ is convenient to Bental and efficient from the perspective of interstate judicial resources, even if it implicates matters of little interest to Illinois and imposes a travel burden on SZ.

### B. Forum Non Conveniens

SZ advocates for an alternative to dismissing the case under Rule 12(b)(2): dismissal on *forum non conveniens* grounds. SZ proposes that trial in a German forum will best serve the convenience of the parties. For the reasons explored below, the Court agrees.

### 1. *Legal Standard*

The common law doctrine of *forum non conveniens* allows a trial court to dismiss a suit over which it would normally have jurisdiction if it best serves the convenience of the parties and the ends of justice. *In re Bridgestone/Firestone, Inc.*, 420 F.3d 702, 703 (7th Cir. 2005). Federal courts have discretion

to dismiss a case based on this doctrine when an adequate available forum exists and "trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience, or the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Co.,* 549 U.S. 422, 429 (2007) (alterations omitted) (quotation omitted). The defendant bears the burden of persuasion on all issues related to *forum non conveniens*. *Sinochem,* 549 U.S. at 430. On a motion to dismiss for improper venue, the district court need not view the allegations in the complaint as the exclusive basis for its decision, but may look beyond them. *Deb v. SIRVA, Inc.,* 832 F.3d 800, 808-09 (7th Cir. 2016).

The analysis thus proceeds in two parts. First, the Court examines whether the proposed alternative forum is "available" and "adequate." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n.22 (1981). If so, then the Court proceeds to examine the private and public interest factors set forth in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501 (1947).

## 2. *Germany Is an Available and Adequate Forum*

An alternative forum is "available" if all parties are amenable to service of process and are subject to jurisdiction

- 28 -

in that forum. *Stroitelstvo Bulgaria Ltd. v. Bulgarian-American Enterprise Fund,* 589 F.3d 417, 421 (7th Cir. 2009). The forum is "adequate" if it provides a fair hearing that offers a potential remedy for the subject matter of the dispute. *Ibid.* The remedy need not be as comprehensive or as favorable as the American claims; they need only offer some avenue of redress. *Ibid.*

In support of an availability and adequacy determination, SZ offers the affidavit of Professor Hans-Eric Rasmussen-Bonne, an attorney who practices in Germany and is a member of the New York bar in good standing; holds a Ph.D. from the University of Illinois in conflicts and jurisdictional issues; and has researched and taught at Emory University, Dresden University, and the University of Illinois. After analyzing the allegations in the Complaint and other submissions, Professor Rasmussen-Bonne concluded that Bental would be able to assert jurisdiction over SZ in Germany. He came to this conclusion by noting that international personal jurisdiction of German courts in this case would be governed by European Union and German national law. On the reasonable assumption that SZ is only domiciled in Germany, Professor Rasmussen-Bonne concluded that European Community Council Regulation (EC) No. 44/2001 on Jurisdiction and the Recognition of Judgments in Civil and Commercial Matters

(as amended) would govern jurisdiction over SZ, meaning that "German courts would have general international personal jurisdiction to adjudicate claims against [SZ] including the claims brought by the plaintiff in this case." (Def.'s Mem., Ex. B at 2.) Given his obvious expertise in these areas and his detailed declaration on this score, the Court accepts and adopts his conclusions. Germany is "available" to Bental.

The Court additionally notes that SZ consents to personal jurisdiction in Germany. (*See, e.g.,* ECF No. 16 ("Def.'s Reply") at 11 ("As referenced in SZ's Memorandum, as a condition to a forum non-conveniens dismissal, SZ has indicated it is willing to submit to the jurisdiction of the German courts. . . .").) SZ's willingness to do so bolsters a finding that Germany is an available forum. *See, e.g., Barcode Informatica Limitada v. Zebra Techs. Corp.,* No. 08 C 2021, 2011 WL 1100449, at *2 (N.D. Ill. Mar. 23, 2011).

With respect to adequacy, Professor Rasmussen-Bonne opines that "German law provides adequate remedies for claims for damages and for unjust enrichment." (ECF No. 11, Ex. B at 1.) These approximate the remedies Bental seeks in its breach of contract, state-law commission, and unjust enrichment counts. (Specific to Germany's adequacy for unjust enrichment claims, recall that SZ responded to the initial demand letter from

Bental's German counsel by making demands under German unjust enrichment law for return of commission payments.) The professor's affidavit goes on to note that principal-agent commercial cases are routine in German courts, governed by a body of extensive literature and case law. To the extent that the penumbra of potential redress in Germany may nonetheless fall short of that available in U.S. courts, this is not dispositive to the adequacy determination. *See, e.g., Stroitelstvo,* 589 F.3d at 421. So too if Bental cannot pursue in Germany one of its specific causes of action asserted here. *See, e.g., ibid.* ("[F]ederal courts have routinely held that the loss of a . . . claim does not by itself preclude *forum non conveniens* dismissal.") (citation omitted). It is therefore clear in this case that Germany provides at least "some potential avenue for redress for the subject matter of the dispute." *Ibid.* (citing *Kamel v. Hill-Rom Co., Inc.,* 108 F.3d 799, 802 (7th Cir. 1997)). As such, the Court similarly accepts and adopts Professor Rasmussen-Bonne's conclusion that Germany is "adequate" to redress Bental's claims.

While the Court would prefer a more detailed enumeration of precisely what German causes of action Bental could pursue, this is not a situation like that in *Deb* where "to the extent the defendants offered any evidence at all, it was evidence that

would not, in fact, be subject to jurisdiction" in the foreign forum. 832 F.3d at 810-813 (finding that defendants did not meet their burden where they argued for adequacy "without evidence, without expert testimony, and without a concession to jurisdiction"). Further, Bental itself submitted documents indicating that it initially retained German counsel to make claims on SZ under German law. (*See, generally,* Pl.'s Br., Ex. A.) If Germany is an inadequate forum, it is difficult to understand why Bental's first inclination – even before filing suit in federal court in Ohio – was to make such demands on SZ.

Therefore, the Court finds that Germany is an available and adequate forum – and hence provides an "alternative" forum for purposes of *forum non conveniens* analysis.

### 3. *The Public and Private Interest Factors Favor Dismissal*

Because Germany is an available and adequate forum, the Court turns to examining the private and public interests at stake.

#### a. *Private Interest Factors*

The private interest factors that a court may consider include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to

the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil,* 330 U.S. at 508. The enforceability of a judgement, if one is obtained, is also a private interest factor. *Ibid.*

The Court finds that the private interest factors favor dismissal. Both the "relative ease of access to sources of proof" and the "availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses" support dismissal in favor of a German forum. Related factors, such as translation expenses and Bauerle's fluency in German, also buttress dismissal. (Bental has not argued that any judgment it would receive in Germany would be unenforceable. The possibility of viewing the premises seems inapt in this case.)

Most of the relevant evidence – including all SZ's original documents and witnesses – is located in Germany. (Schmidt Decl. ¶¶ 39-40.) This typically suggests that the first factor be deposited on the dismissal side of the ledger. *See, e.g., Clerides v. Boeing Co.,* 534 F.3d 623, 629 (7th Cir. 2008) (noting that most of the evidence and witnesses were located in the foreign forum). While Bental claims that several potential witnesses who are Nordex USA and Siemens employees reside in Illinois, Florida, and Kansas, the Court is not willing to

prioritize the convenience of third-party discovery over the exigencies of first-party discovery. For one, the extent to which such third-party discovery will be necessary is unclear, notwithstanding Bental's claim that these are "key witnesses." (Pl.'s Br., Ex. B ¶¶ 51-52.) As far as the Court can discern, besides Bauerle, no one in the U.S. participated in negotiating the Commission Agreement or amending it – and much of his own participation was in Germany. For another, the damages evidence is more likely to be in Germany than in Ohio, Illinois, or Florida. The commissions payable to Bental were to be calculated in Euros, per the Commission Agreement, and these commissions were to be calculated based on the Euro value of SZ's sales – the original records of which reside with SZ. (Schmidt Decl. ¶¶ 36-38.)

Further, with respect to first-party discovery, Bental is comprised of one individual who would need to travel and give testimony abroad, and he speaks both German and English. (Indeed, SZ alleges without objection that Bauerle has or had German citizenship. (Schmidt Decl. ¶ 16.) And he is fluent enough in the language to have translated documents for Nordex USA's and SZ's benefit, further supporting the notion that he enjoys a comparative linguistic advantage over SZ personnel.) Simply put, both parties can transact in German, but only

Bauerle appears to have English-language skills. It will be easiest in terms of access to evidence and cheaper in terms of translation expenses for Bauerle to travel to Germany, give testimony in German, and have a German court interpret the original German-language documents (including the Commission Agreement). The fact that Bauerle traveled to Germany several times during the parties' course of dealing – whereas SZ executives are not alleged to have traveled to the United States, and indeed could not attend the U.S. trade show that spawned the parties' affiliation – further suggests that he is the more convenient bearer of these burdens.

This dovetails with document-specific complications of the case remaining here – such as the need to translate documents and testimony into English. *See, e.g., Stroitelstvo,* 589 F.3d at 425 (upholding the district court's dismissal and noting that "[t]ranslating all of the Bulgarian discovery documents into English for a U.S. court would also be costly"). This problem is exacerbated in breach of contract cases such as this one in which entitlement to relief might well turn on particular wording in the contract (both the Commission Agreement and its amendment were drafted and executed in German). While the Court appreciates Bental's earnest offer to help mitigate expenses by having Bauerle translate documents, out of impartiality concerns

the Court would require a second translation of such documents anyway.

Moreover, to obtain testimony of involuntary witnesses, the Court would be required to navigate the Rube Goldberg contraption of the Hague Convention, which governs the taking of evidence abroad. Pursuant to that process, this Court would write letters rogatory requesting evidence to the United States Department of Justice, Civil Division, who would then forward them to the competent German authority, who would then process them and transmit them to the relevant Germany entity or individual. Based on Professor Rasmussen-Bonne's experience, it "takes between three and six months until the Letter of Request reaches the defendant." (Def.'s Mem., Ex. B at 3.) Such obstacles suggest that information is much more easily obtained in the foreign forum. *See, Clerides,* 534 F.3d at 629-30 ("[T]he court concluded reasonably that the superiority of live testimony and the inconvenience of taped depositions obtained by letters rogatory favored dismissal."); *Vivendi SA v. T-Mobile USA Inc.,* 586 F.3d 689, 696 (9th Cir. 2009) ("Moreover, the district court concluded, based on its experience, that the ability of the court to compel unwilling witnesses to testify slightly favors dismissal because the Hague Convention's letters rogatory process, which would be necessary to produce proof for

an American trial, is more cumbersome than European Commission Regulations for taking evidence within Europe, which would be necessary to produce proof for a European trial.").

Therefore, the private interest factors favor dismissal.

### b. Public Interest Factors

The Court must also weigh the public interest factors, including "the administrative difficulties stemming from court congestion; the local interest in having localized disputes decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Gulf Oil,* 330 U.S. at 508-09. Unfortunately for Bental, the public interest factors also make a convincing case for *forum non conveniens* dismissal.

First, to the extent the "court congestion" factor is worthy of consideration here, it does not support maintenance of the case in this Court. In 2015, this District was the busiest in the Seventh Circuit in terms of cases filed (and the fourth-busiest in the entire United States). U.S. Courts, Caseload Statistics 2015: Table C-5, U.S. District Courts – Median Time Intervals From Filing to Disposition of Civil Cases, *available*

*at* http://www.uscourts.gov/sites/default/files/c05mar15_0.pdf
(last visited July 13, 2017). The median time from filing to
trial in civil cases was 28.8 months. *Ibid.; see also, In re
Factor VIII or IX Concentrate Blood Prods. Litig.,* 484 F.3d 951,
958 (7th Cir. 2007) ("To the extent that court congestion
matters, what is important is the speed with which a case can
come to trial and be resolved.") (citation omitted). While the
parties have not furnished the Court with information about
court congestion in Germany, other federal courts to consider
such evidence have found that "German courts generally are able
to dispose of cases more quickly, and have less crowded
dockets[,] than either American courts generally or courts in
[this district] in particular." *Blum v. Gen. Elec. Co.,* 547
F.Supp.2d 717, 734 (W.D. Tex. 2008) (crediting defendant's
evidence that case duration in German courts was "4.4 months for
district courts and 7.2 months for the regional courts" and that
there were "64 pending cases per judge in Germany compared to
1,164 pending cases per judge in the United States"). In any
event, the Court doubts that tribunals in the State of Sachsen-
Anhalt, Germany (where SZ has its principal place of business)
face congestion comparable to that prevailing in this District.
Because, given the sheer traffic in this District, it is likely
that the case could proceed much more quickly to trial in

Germany and also impede fewer other plaintiffs' suits, this *Gulf Oil* factor favors dismissal. *See, e.g., In re Air Crash at Madrid, Spain, on August 20, 2008,* 893 F.Supp.2d 1020, 1042 (C.D. Cal. 2011) ("The Court does not have comparable statistics for Spanish courts, but it is beyond dispute that this Court faces significant congestion. Hearing these cases would contribute to the congestion in the U.S. courts. . . . [and] impede the ability of local litigants to try their cases in this district.") (quotation and internal quotation marks omitted).

Next, in contrast to Germany, Illinois has little to no localized interest in deciding this dispute. The Commission Agreement governs the past relationship between an Ohio and German entity; it is a creature of either Ohio or German law. The only Illinois player in this case, Nordex USA, is not alleged to have done anything wrong, nor is SZ's conduct alleged to have wronged any Illinois resident. Further, because it is not a citizen of Illinois, Bental is not entitled to the presumption in favor of a resident plaintiff's choice of venue. *See, Sinochem,* 549 U.S. at 430 ("When the plaintiff's choice of forum is not its home forum, however, the presumption in the plaintiff's favor 'applies with less force,' for the assumption that the chosen forum is appropriate in such cases is 'less reasonable.'") (quoting *Piper Aircraft,* 454 U.S. at 255-56). In

fact, Bental acknowledges that "because it is not a resident of the present forum, the strong presumption in favor of its chosen forum is somewhat lessened." (*See,* Pl.'s Br. at 14 (citing *Deb,* 832 F.3d at 806).) That Bental first sued in its home forum before bringing suit here further belies the notion that this forum is appropriate. Absent this presumption, both the "localized interest" and "unfairness of burdening citizens in an unrelated forum with jury duty" militate in favor of *forum non conveniens* dismissal. *See, e.g., Stroitelstvo,* 589 F.3d at 425 ("Since this loan is so unrelated to the local forum, calling Chicago-area citizens for jury duty on this case would be asking a lot.") (citation omitted).

In addition, because all Bental's claims save the unjust enrichment count expressly turn on the existence of a valid contract with SZ, the law in this diversity case that "must govern the action" is more fairly said to be German or Ohio law, notwithstanding Bental's single claim under the Illinois commission statute. Even if the presence of that claim, on an interpretation of *Gulf Oil* charitable to Bental, means that Illinois law "must govern the action," "the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action" would not favor an Illinois forum. It would at best weigh only neutrally in light of the

other causes of action asserted, including an analogous Ohio statutory cause of action and a breach-of-contract count governed by either Ohio or German law.

In any event, there still remains the thorny issue of avoiding "unnecessary problems in conflicts of laws or in the application of foreign law." On the assumption that Bental contests application of German law, then the Court would be forced to engage in a choice-of-law analysis without the benefit of any relevant provision in the contract. Facts relevant to this analysis would be the parties' residence in Ohio and Germany, their negotiation of the Commission Agreement in Germany and on Ohio-Germany telephone calls, its execution apparently in each country, performance by SZ in Germany and Bental in the United States, payment by SZ in Euros, and so on. And even if Bental would not contest application of German law, this *Gulf Oil* factor would favor dismissal, as the Court would nonetheless be tasked with applying unfamiliar German contract law. *Forum non conveniens* is "designed in part to help courts avoid conducting complex exercises in comparative law." *Piper Aircraft,* 454 U.S. at 251 ("[T]he public interest factors point towards dismissal where the court would be required to 'untangle problems in conflict of laws, and in law foreign to itself.'") (quoting *Gulf Oil,* 330 U.S. at 509).

- 41 -

As with the private interest factors, the public interest factors similarly favor dismissal.

*    *    *

In summary, the Court finds that both the private and public interest factors support dismissing the case on *forum non conveniens* grounds. Because it is more convenient for a German court to adjudicate this case, the Court is willing to enter an order of dismissal subject to the conditions stated below.

### 4. Conditions of Dismissal

Because the Court has personal jurisdiction over SZ and subject-matter jurisdiction based on diversity, it has authority to subject SZ to conditions of *forum non conveniens* dismissal. *Cf., Sinochem,* 549 U.S. at 435 (reserving decision on whether a court conditioning a *forum non conveniens* dismissal on the waiver of jurisdictional or limitations defenses in the foreign forum must first determine its own authority to adjudicate the case).

First, SZ must agree to consent to personal jurisdiction in Germany, accept service of process, and waive any statute-of-limitations defense to Bental's claims that did not exist prior to initiation of the instant lawsuit (unless such a defense relies on Bental's failure to bring suit timely after the date on which the Court enters a dismissal order). *See, e.g.,*

*Pettitt v. Boeing Co.,* No. 09 C 3709, 2010 WL 3861066, at *2 (N.D. Ill. Sept. 28, 2010); *Gonzalez v. Ford Motor Co.,* MDL No. 1373, 2010 WL 1576831, at *3 (S.D. Ind. Apr. 19, 2010), *aff'd,* 662 F.3d 931 (7th Cir. 2011); *In re Air Crash Near Athens, Greece on August 14, 2005,* 479 F.Supp.2d 792, 805 (N.D. Ill. 2007).

Second, SZ must agree to advise the German court that it does not object to the admissibility of depositions taken in the U.S. or other materials obtained in discovery in the U.S. simply on the basis that the depositions or other materials were obtained outside Germany. *See, e.g., In re Factor VIII,* 531 F.Supp.2d 957, 983 (N.D. Ill. 2008), *aff'd,* 563 F.3d 663 (7th Cir. 2009). Of course, SZ would retain the right to object on any other grounds recognized by applicable evidence rules.

Upon the filing of SZ's statement that it agrees to these conditions, the Court will enter an Order dismissing this action on the ground of *forum non conveniens.* The statement should be filed no later than fourteen (14) days from the date of this opinion. The dismissal of the case will be without prejudice to its reinstatement in this Court should SZ fail to abide by any of the above conditions. *See, King v. Cessna Aircraft Co.,* 562 F.3d 1374, 1383-84 (11th Cir. 2009); *Tarasevich v. Eastwind*

*Transp. Ltd.,* No. 02 C 1806, 2003 WL 21692759, at *4 (S.D.N.Y. July 21, 2003).

## IV.  CONCLUSION

For the reasons stated herein, Defendant's Motion to Dismiss [ECF No. 10] is denied under Rule 12(b)(2) but granted under Rule 12(b)(3) on *forum non conveniens* grounds.  The Court will enter an Order dismissing the case upon receiving within fourteen (14) days of the date of this Opinion a written statement of SZ agreeing to submit to personal jurisdiction in Germany, accept service of process, waive certain statute-of-limitations defenses to Bental's claims, and advise the German court that it does not object to admission of evidence obtained in the U.S. solely because that evidence was obtained outside Germany.  The dismissal will be without prejudice to reinstatement in this Court should SZ fail to abide by these conditions.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: August 2, 2017